IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**AVERY L. JONES**,

Plaintiff,

vs. **No. CIV 99-902 LCS**

**SOUTHWEST AIRLINES,**

Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment, filed March 23, 2000 *(Doc. 23)*, Defendant's Motion to Strike Affidavit of Avery Jones, filed April 24, 2000 *(Doc. 32)*, and Plaintiff's Motion for Leave to File Response, filed May 23, 2000 *(Doc. 37)*. The Court, having considered the motions, the memoranda submitted by the parties and the applicable law, finds that Defendant's Motion for Summary Judgment is not well taken and will be denied. Because my disposition of Defendant's Motion for Summary Judgment does not require consideration of Plaintiff's affidavit, Defendant's Motion to Strike and Plaintiff's Motion for Leave are moot and will be denied on that basis.

**I. Factual Background**

This case arises out of Defendant Southwest Airlines' termination of Plaintiff Avery Jones, an African-American citizen of the United States, following an altercation that occurred on December 8, 1997. A number of facts are in dispute as to what took place during that incident, but viewing the evidence in the light most favorable to the Plaintiff yields the following sequence

of events.

Plaintiff was employed as a ramp agent by Defendant from November 3, 1990 until his termination on December 11, 1997. On December 8, 1997, Plaintiff called another ramp agent, Greg Rullman, to ask whether Rullman could come in to work a shift trade. Rullman, a Caucasian, agreed to work the shift, believing that he would be trading shifts with Plaintiff. In fact, Rullman was working a shift for another employee, Robert Cota. When Rullman came in to work the shift, he discovered that he would be working for Cota. Rullman became upset, and confronted Plaintiff in the break room, alleging that Plaintiff lied to him about the shift trade.

Some time later, Plaintiff had to deliver bags to the gate where Rullman was working. Rullman continued the prior argument, poking Plaintiff in the chest and slapping him in the face. Plaintiff told Rullman to "chill out," but Rullman continued to strike at Plaintiff. Plaintiff eventually wrestled Rullman to the ground when other co-workers arrived to break up the fight.

Plaintiff and Rullman were suspended without pay until the next day. A fact-finding hearing was held on December 9, 1997. Both Plaintiff and Rullman were terminated after the fact-finding hearing, effective December 11, 1997.

Plaintiff and Rullman appealed their terminations to the System Board of Adjustment, a panel of two union and two management representatives established pursuant to a contract between Defendant and the union representing the ramp agents. Regional Director Willie Edwards presented Defendant's position before the System Boards, i.e., that both men should be terminated for fighting on the job, and also discussed both men's performance appraisals and attendance records. The System Board voted unanimously to maintain the termination of Plaintiff. However, the System Board deadlocked, 2-2, over whether to maintain the termination of Rullman. In lieu of proceeding to arbitration, Defendant decided to reinstate Rullman, in part

because "Mr. Rullman had a good work history. His supervisors rated his performance superior in some categories and satisfactory in most others. Although Mr. Rullman had some problems with attendance at one time, he no longer had those issues as of December 1997." *See* Ex. G to Def.'s Mem. of Law *(Doc. 24)*.

At the time of the incident, Defendant had in place a section in its personnel manual, "Basic Rules of Conduct," providing in part that "[a]ny employee who strikes another employee in a display of anger shall be terminated." *See* Ex. B to Def's Mem. of Law *(Doc. 24)*. Defendant also had in effect a number of other grounds for mandatory termination, including an attendance policy that provided that any employee who accumulated seven or more "points" for being absent or tardy would be terminated automatically. Plaintiff presents evidence that these mandatory termination provisions were not always enforced against other workers. For example, there was a fight between Chris Peterson and Vince Lujan in 1994, in which both stood toe-to-toe, brushed shoulders, bumped chests, and one of the employees pushed the other into a pole. *See* Ex. 29 to Pl.'s Mem. Br. *(Doc. 27)*. Peterson was suspended for three days without pay and Lujan was suspended for one day without pay. There is also evidence that Greg Rullman and Eddie Cahill were fighting in the break room in the presence of a supervisor, yet no discipline was meted out. *See id.* at Ex. 30. Defendant's station manager, Greg Winston, classified this incident as "messing with each other" or "wrestling." *Id.* at Ex. 9. Plaintiff also presents evidence that at least four Caucasian employees, including three ramp employees, exceeded the seven-point limit for automatic termination under the attendance policy, yet were not terminated. *See id.* at Ex. 17.

Plaintiff's final performance appraisal before his termination, in August 1997, indicates that he was rated Superior in two categories, Satisfactory in eight categories, and Unacceptable in six categories. *See* Def's Mem. of Law *(Doc. 24)* at Ex. M. In the year prior to that evaluation,

Plaintiff was absent four days due to reported illness and one day due to a "no-show." *See id.*

**II. Standard of Review**

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A party opposing summary judgment must come forward with sufficient evidence that would support a jury verdict and thereby justify sending the case to the jury.[1] *See Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1098 (10th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *See Dye v. United States*, 121 F.3d 1399, 1403 (10th Cir. 1997).

**III. Analysis**

Plaintiff's complaint states a claim for disparate treatment in violation of Tile VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2, alleging that he was disciplined more severely than non-African-American employees. Disparate treatment claims are evaluated using the three-step approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Plaintiff first must present a *prima facie* case of disparate treatment. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir. 1997). If Plaintiff establishes a *prima facie* case, Defendant may come forward with a legitimate nondiscriminatory reason for the action taken. *See id*. At that point, the burden shifts back to Plaintiff to demonstrate that Defendant's articulated reason is a pretext for unlawful discrimination. *See id.*

---

[1]The Court notes that neither party has requested a trial by jury in this case. Therefore, the Court will serve as the trier of factual disputes in this case.

**Prima Facie Case**

A *prima facie* case of disparate discipline based on race may be established if the plaintiff proves by a preponderance of the evidence that (1) the plaintiff is a racial minority, (2) the plaintiff was disciplined by the employer, and (3) the employer imposed the discipline under circumstances giving rise to an inference of racial discrimination. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000). To establish an inference of racial discrimination, Plaintiff must demonstrate that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness. *See Aramburu*, 112 F.3d at 1404. Comparable employees must be similarly situated in all relevant respects, but they need not be identically situated. *See id.* What is important is that the employees be comparable in those circumstances that are relevant to the employment decision. *See id.*

Southwest Airlines' Basic Rules of Conduct provide that any employee who strikes another employee in anger shall be terminated. In terminating Plaintiff, Southwest Airlines relied on this mandatory termination provision, and apparently did not address Plaintiff's contentions that he was not the aggressor, that he struck Rullman in self-defense, and that he attempted to get Rullman to "chill out." Southwest Airlines did not assert poor attendance or poor work performance as the reason for his termination in the December 11, 1997 termination letter. Therefore, the circumstances relevant to the employment decision appear to be the employee's position, whether the employee was subject to the Basic Rules of Conduct, and whether the employee struck another employee in anger.

Plaintiff presents four examples of non-African-American employees who were not terminated even though they allegedly participated in fights with other employees. The first of these incidents involves Greg Rullman's discipline for participating in the December 1997 fight

with Plaintiff. The second example involves Vince Lujan, a Hispanic employee, who received only a one-day suspension for an alleged fight in 1994 with another African-American employee, Chris Peterson. Plaintiff's third example involves two Caucasian employees, Greg Rullman and Eddie Cahill, who were not disciplined for an alleged fight or wrestling incident in the break room in 1995, even though that incident occurred in the presence of a supervisor. The final incident cited by Plaintiff involved a Hispanic employee, Joe Mascarenas, and a Caucasian employee, Robbie Johnson, who allegedly were fighting in the hallway and made a hole in the wall.

Incident Involving Plaintiff and Greg Rullman

There is no doubt that Plaintiff and Rullman were "similarly situated" up until the System Board decision. Both employees were ramp agents in the same work area, reporting to the same chain of supervision, and were accused of the same misconduct, i.e., participating in a fight. Defendant argues that because the System Board voted to uphold Plaintiff's termination, but deadlocked on whether to uphold Rullman's termination, the employees were no longer "similarly situated" after that point. I agree that after the System Board vote, Plaintiff and Rullman were no longer "similarly situated" because Defendant would have been obligated under its agreement with the Union to expend additional costs and efforts if it persisted in its termination of Rullman. Defendant claims that this ends the inquiry because Plaintiff has failed to present a *prima facie* case of disparate discipline.

Under the circumstances of this case, the inquiry is more complex. I conclude that the difference in the System Board votes does not automatically defeat Plaintiff's claim vis-a-vis Rullman at the *prima facie* case stage of the *McDonnell Douglas* process, but is more appropriately analyzed as a legitimate nondiscriminatory reason that is offered by Defendant at the second stage in the analysis.

There appear to be factual disputes as to whether Defendant's own conduct in the disciplinary process created the dissimilarity in the System Board vote. The evidence in the record, when viewed in the light most favorable to Plaintiff, does not bear out Defendant's assertion that the System Board process is independent of management. Two of the four members of each board are appointed by management. Defendant acknowledges that it appointed two different individuals to Plaintiff's board than it appointed to Rullman's board, but the record does not indicate the process used by Defendant to select its representatives. Furthermore, Defendant alone was responsible for presenting the case for termination to the System Board. There is evidence that Defendant may have presented a more sympathetic case for Rullman than for Plaintiff, including evidence characterizing Rullman's job performance and work history as superior to Plaintiff's. Defendant repeatedly asserts this position, i.e., that Rullman had a good work history and was a more valued employee than Plaintiff. Yet, the Court cannot conclude that Plaintiff and Rullman had any significant difference in evaluations or attendance. For example, Willie Edwards states that Rullman's latest evaluation showed Rullman's performance was superior in some categories, and satisfactory in most of the others. Plaintiff's evaluation showed that he was rated superior in two categories, and satisfactory in eight of the fourteen remaining categories - which does not appear different from Willie Edwards' description of Rullman's evaluation. Similarly, there is evidence that Rullman, like Plaintiff, had attendance problems in the past, but as of December 1997 the attendance of both employees was within the acceptable range.

It is difficult for me to accept Defendant's position that Defendant can be shielded from liability at the *prima facie* case stage of inquiry solely because of the different System Board votes. Defendant set up the disciplinary appeals process, selected two of the four board members, controlled the evidence that was submitted to the board, and discussed subjective matters such as

performance appraisals in closing arguments before the boards even though those matters did not relate to the issue for which the employee was being terminated. Prior to the System Board vote, when viewing the evidence in the light most favorable to Plaintiff, Plaintiff and Rullman were more than just similarly situated - they were almost identically situated. To find that a different vote at an intermediate appeals stage in the disciplinary process makes employees “differently situated” would permit any discriminatory employer to avoid Title VII liability by providing a “sham” appeals process in which minority employees were virtually guaranteed of a poorer outcome than non-minority employees. Note that I am not suggesting here that Defendant’s appeals process is designed to be a sham or to promote discriminatory results; I am only suggesting that Defendants’ position that an intermediate outcome in a disciplinary process can create “dissimilarities” between minority and non-minority employees is untenable for policy reasons. I conclude that the better rule is to consider at Step One of the *McDonnell Douglas* analysis only those factors that are inputs to the original disciplinary process in determining whether employees are similarly situated. An employer may offer at Step Two a legitimate nondiscriminatory reason for taking the action it did, including different intermediate outcomes by partially or totally independent review boards. The burden would then shift back to Plaintiff to demonstrate pretext.

Using this approach, Plaintiff meets its burden to establish an inference of discriminatory disparate treatment at Step One based on this incident. Plaintiff and Rullman were similarly situated because they were in the same job position, i.e., ramp agent, reported to the same supervisors, were subject to the same work rules, and were accused of similar conduct. Defendant claims that Plaintiff’s work history was poorer than Rullman’s; however, the evidence put forward by Defendant does not bear this out. Both Rullman and Plaintiff were rated superior

in some categories, were rated satisfactory in a majority of the remaining categories, and had attendance records that were within the seven-point limit, although both had problems with attendance in the past. The different System Board decisions will be analyzed under Steps Two and Three of the analysis.

<u>Incident involving Lujan and Peterson</u>

The facts of this incident, presented in the light most favorable to Plaintiff, are that Chris Peterson, an African-American employee, pushed Vince Lujan, a Hispanic employee, into a pole after the two became involved in an argument. Both stood toe to toe, brushed shoulders or chests, and threatened each other. Lujan was suspended without pay for one day, while Peterson was suspended without pay for three days. Neither was accused of striking a fellow employee in anger.

I conclude that this incident cannot be used to establish a *prima facie* case of disparate discipline because there is no evidence that the non-African-American employee, Lujan, struck Peterson.[2] Therefore, Lujan is not similarly situated to Plaintiff. Although Peterson's actions in shoving Lujan into a pole could be considered "striking a fellow employee in anger" and therefore similar to Plaintiff's alleged conduct, Peterson is also African-American; therefore, no inference of

---

[2]Defendant repeatedly asserts that the comparison in a disparate treatment analysis is between the treatment afforded "minority" and "non-minority" employees, with non-minority including only non-Hispanic Caucasian employees. *See* Def.'s Mem. at 15-16. This is incorrect. The correct comparison is between the treatment afforded a plaintiff who is a member of a protected class (i.e., "minority"), and employees who are not members of that protected class (i.e., "non-minority."). *See E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 148 (7th Cir. 1996). Thus, with respect to a plaintiff who is a member of the African American racial "minority" class, "non-minority" employees would include Hispanic employees, even though Hispanic employees are members of a protected national origin minority class. Any other interpretation would permit members of one racial or ethnic minority group to discriminate against members of another minority group. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 429 (1971) (Title VII proscribes discriminatory preference for any group, minority or majority).

racially motivated disparate treatment can follow.

Incident involving Rullman and Eddie Cahill

Plaintiff presents evidence that Rullman and Cahill were engaged in a fight in the break room in the presence of at least one supervisor, yet no discipline was handed out. Defendant admits that this incident occurred, but classifies this as "messing with each other, playing around, and grabbing one another, and maybe wrestling." *See* Def.'s Mem. at Ex. D. Plaintiff, a witness to the incident, insists that it was a fight. I find that there is a material dispute as to the facts of this incident. Viewed in the light most favorable to Plaintiff, the wrestling between these two employees could be similar to Plaintiff's claim that he wrestled Rullman to the ground in self-defense. There was admitted physical contact between the two Caucasian employees; whether the contact was made in anger or in jest is disputed. A reasonable trier of fact could believe Plaintiff that the Rullman-Cahill incident was a fight in anger. Therefore, this incident can support a *prima facie* case of disparate treatment.

Incident involving Mascarenas and Johnson

Plaintiff claims that Mascarenas, a Hispanic employee, and Johnson, a Caucasian employee, were not disciplined even though they were involved in an altercation in a hallway that created a hole in the wall. Plaintiff presents no first-hand evidence of the incident. The only evidence that could be admissible at trial is Gregory Winston's testimony that he was aware of an incident of "messing around" or "horseplay" involving these individuals. *See* Def.'s Mem. at Ex. D. Because Plaintiff does not meet his evidentiary burden to show that these employees were involved in the same type of alleged misconduct as he was accused of, this incident cannot support an inference of discriminatory disparate treatment.

Based on the incidents involving Plaintiff and Rullman, and Rullman and Cahill, I conclude

that at Step One of the McDonnell Douglas analysis, Plaintiff has presented sufficient evidence to establish a material question of fact on whether he was treated differently from non-African-American employees. Because there is no dispute that the other two elements of a *prima facie* case are satisfied (i.e., Plaintiff is a member of a protected class and Plaintiff was disciplined for violating a work rule), the analysis proceeds to the second stage of the inquiry.

**Legitimate Nondiscriminatory Reasons Offered by Defendant**

Defendant comes forward with two legitimate nondiscriminatory reasons for terminating Plaintiff and not terminating other employees who may have been engaged in similar fights. First, with respect to the December 1997 incident, Defendant claims that Plaintiff was terminated and Rullman was not because of the different System Board votes. Because the System Board unanimously upheld Plaintiff's termination but split over Rullman's termination, Defendant would have to present the Rullman termination to an arbitration panel under the collective bargaining agreement with the union. I conclude that this added expense is a legitimate nondiscriminatory reason that meets Defendant's burden of production under Step Two of the McDonnell Douglas test.

Defendant also argues that Plaintiff had a poorer work record than other employees, especially Rullman. Therefore, Defendant argues that it was justified in reinstating Rullman after the System Board vote instead of proceeding to arbitration. Again, I conclude that this is a legitimate nondiscriminatory reason that meets Defendant's burden of production.

**Pretext**

At Step Three of the Mc Donnell Douglas inquiry, the burden shifts back to Plaintiff to show that the legitimate nondiscriminatory reasons offered by Defendant is mere pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804. At this stage, Plaintiff may introduce

evidence of Defendant's general policy and practice involving minority and non-minority employees; Defendant's treatment of Plaintiff during his period of employment; and whether Defendant's treatment of Plaintiff conformed to a general pattern of discrimination. *See id.* at 804-05.

Plaintiff introduces evidence that Defendant's written policy purports to mandate termination of any employee who engages in fighting without any exceptions. Yet, Defendant admits that it introduced seemingly irrelevant information on Rullman's allegedly superior work record at Rullman's System Board hearing. This disparity between written policy (mandatory termination) and practice (introducing favorable yet irrelevant evidence on work history) could support a finding of pretext. Plaintiff also introduces evidence that Caucasian employees who engage in fighting, such as Rullman and Cahill, are not disciplined because their fighting is viewed as horseplay while African-American employees are viewed as intimidating. *See* Pl.'s Mem. Br. at Ex. 9, 30, 31. Plaintiff also presents evidence that Caucasian employees who violate other mandatory termination provisions, such as the "seven point" attendance policy, are not terminated. *See id.* at Ex. 17. Taken together, this evidence viewed in the light most favorable to Plaintiff could establish pretext.

Defendant also alleges that Plaintiff's poor work history justifies different treatment. As discussed above, the scant evidence presented by Defendant does not indicate that Rullman's performance was any different from Plaintiff's performance. Plaintiff points out that his attendance at the time of termination was within Defendant's seven-point limit. Because there are material issues of fact as to whether Plaintiff's allegedly poorer work record justified disparate treatment, I conclude that Plaintiff could establish that this asserted reason for his termination was pretext.

## IV. Conclusion

Because there are material issues of fact at Steps One and Three of the *McDonnell Douglas* analysis, summary judgment must be denied. It was not necessary for the Court to consider evidence in Plaintiff's affidavit to reach this decision. Therefore, Defendant's Motion to Strike and Plaintiff's Motion for Leave to File Response are moot and will be denied on that basis.

Wherefore,

IT IS ORDERED that Defendant's Motion for Summary Judgment *(Doc. 23)*, filed March 23, 2000, is **denied**.

IT IS FURTHER ORDERED that Defendant's Motion to Strike Affidavit of Avery Jones *(Doc. 32)*, filed April 24, 2000, and Plaintiff's Motion for Leave to File Response *(Doc. 37)*, filed May 23, 2000, are **denied as moot**.

LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE