IN THE UNITED STATES DISTRICT COURT FILED

FOR THE DISTRICT OF NEW MEXICO

00 OCT 10 PM 3:38

AVERY L. JONES,

Plaintiff,

v.

SOUTHWEST AIRLINES,

Defendant.

CIV No. 99-902  LCS-ACE

## DEFENDANT SOUTHWEST AIRLINES' REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Southwest Airlines ("Southwest Airlines") requests that this Court make the following findings of fact and conclusions of law upon the evidence submitted at the trial of this action.

### Proposed Findings of Fact

A.   Parties.

1.   Plaintiff Avery Jones ("Jones") is an African-American citizen of the United States.

2.   Defendant Southwest Airlines ("Southwest Airlines") is a national airline carrier doing business in the State of New Mexico.

3.   Southwest Airlines hired Jones as a part-time ramp agent on about November 3, 1990 at its Albuquerque Airport location.  Jones later became a full-time ramp agent.



B.    Employment Relationship Background.

4.    The 1995-1999 Agreement between Southwest Airlines Co. and Southwest
Airlines Ramp Operations Provisioning Association (currently known as
TWU-Local 555) ("Union Contract") governed the employment relationship,
in pertinent part, between Jones and Southwest Airlines.

5.    Southwest Airlines Ground Operations Manual Basic Rules of Conduct set
forth duties and responsibilities for station personnel, including Jones, and a
list of reasons for reprimand or discharge.

6.    The Basic Rules of Conduct, in effect in December, 1997, provided that "any
violation of the following will be grounds for disciplinary action.  Discipline
may range from a reprimand to discharge, depending on the circumstances."

(1)    "Excessive absenteeism or tardiness or failure to maintain a
satisfactory attendance record."

(3)    "Restricting work, using threatening or abusive language,
intimidating, coercing or interfering with fellow employees or
their work."

(4)    "Participating in a fight with another employee."

(5)    "Engaging in horseplay."

(9)    "Unacceptable or immoral behavior on Company property."

(21)    "Abusive and disrespectful behavior to a fellow SWA
employee or Customer."

2

    (33) "Any employee who strikes another employee in a display of anger shall be terminated."

C. <u>Jones' Employment History</u>

7. Throughout his employment with Southwest Airlines, Jones had documented performance and attendance problems.

8. Jones' most recent performance evaluation in August 1997 (four months before he was terminated) shows that in the first category of "Attitude", Jones was rated overall as "unacceptable." In the Attitude category, Jones received unacceptable ratings for "safety conscious", "care-employees/company", helpful/cooperative" and "productive." These were the lowest scores possible in the evaluation. Only his "grooming" was rated "superior." In the second category of attendance, Jones again overall was rated "unacceptable." In the third overall category of "Aptitude", Jones was given an overall rating of satisfactory, but he still received "unacceptable" ratings for "safety" and "driving regulations." Jones' supervisor wrote on this performance evaluation that Jones' attitude towards his supervisors needed improvement and that he needed to be more courteous and respectful to them. The supervisor also wrote that Jones needed to assist other employees more often and in every capacity and that he had been late to flights frequently.

9. As of July 21, 1997, pursuant to the Union Contract, Jones was given a warning letter regarding his poor attendance. Over a four-year period, Jones

received 12 written letters regarding his tardies, no shows and attendance problems.

10.     In about May, 1997, Jones was found to have been obstructive, to have engaged in unacceptable behavior and to have failed to carry out his job duties. He was given a final written warning as of May 14, 1997. Jones filed a grievance regarding the written warning. In lieu of proceeding to a System Board Southwest Airlines later decided to remove the final letter of warning and to give Jones another chance. As part of this decision, Mr. Willie Edwards, then Director of Ground Operations, stated that immediate improvement was necessary in Jones' performance and asked that Jones be given a performance appraisal at the earliest opportunity to assist with this goal.

11.     In 1996, Jones was found insubordinate by a supervisor.

12.     In 1995, Jones was found insubordinate by a System Board.

13.     At least one co-worker of Jones found that Jones' work ethic needed improvement, that Jones did not show up to work when he should have been there and that he took his job for granted.

D.   <u>December 1997 Termination</u>

14.     While on-duty at work on December 8, 1997, Jones and a co-worker, Greg Rullman ("Rullman"), were engaged in a physical fight within public view outside on the tarmac near Gate 6 at the Albuquerque Airport.

15.   Other Southwest Airlines' employees witnessed, at various times, both Jones and Rullman participating in this fight.

16.   Jones ended up with Rullman on the ground.  Jones was seen with his knee in Rullman's chest.

17.   Sandy Judy, one of the Southwest Airlines' employees who witnessed a portion of the fight, reported to Greg Winston, the Southwest Airlines Station Manager, that one employee was assaulting another.

18.   At about this same time, Mr. Winston observed Rullman walking towards him.  Rullman's glasses were broken and he had small abrasions on his face near his glasses.  Since Rullman appeared to have injuries, Mr. Winston directed him to the Company's physician.

19.   Rullman was seen by the physician.  The doctor's written report indicates that Rullman had choke marks on his neck.

20.   In accordance with the Union contract, Mr. Winston immediately suspended both Jones and Rullman, with pay, pending an investigation.

21.   Southwest Airlines investigated the fight between Jones and Rullman.  The investigation included a fact finding meeting held on December 9, 1997.  The meeting was conducted by Mr. Dave DeMeyer, Manager of Ramp and Operations.  Mr. DeMeyer reviewed witness statements and interviewed Jones, Rullman and witnesses to portions of the fight.

22.   After the investigation was concluded, Southwest Airlines concluded that both Jones and Rullman had violated numerous provisions of its Basic Rules

5

of Conduct. Although it was not determined which employee, if either, was the primary instigator of the fight, it was concluded that both men participated in the fight and could have walked away from it but failed to do so.

23.    Accordingly, Mr. Winston terminated both Jones and Rullman, effective December 11, 1997. Mr. Winston's superiors approved the termination decision.

24.    None of the Southwest Airlines decision makers, involved in the termination decision, made disparaging remarks regarding Jones' race.

25.    On December 12, 1997, Jones and Rullman were informed of their terminations, again in accordance with the Union contract provisions.

26.    Southwest Airlines terminated Jones and Rullman for the identical reasons: violations of Southwest Airlines' Basic Rules of Conduct, including: interfering with fellow employees or their work, participating in a fight with another employee, unacceptable behavior on company property, abusive and disrespectful behavior to a fellow employee and/or striking a co-worker in anger.

27.    The Basic Rules of Conduct provide that any of the listed actions, including those identified above in No. 26, "will be grounds for disciplinary action. Discipline may range from a reprimand to discharge, depending on the circumstances."

28. As recently as March 1, 1996, Jones signed a copy of Southwest Airlines' Basic Rules of Conduct that prohibit fighting with a co-worker.

29. Jones read the Basic Rules of Conduct and understood that he could be terminated for participating in a fight with a co-worker.

E. Union Grievance and System Board Hearings

30. Both Jones and Rullman were members of the Transport Workers Union-Local 555 ("TWU- Local 555" or "Union") and were bound by the terms of a collective bargaining agreement negotiated and executed by the Ramp Operations Provisioning Association (currently known as TWU-Local 555) and Southwest Airlines ("Union Contract").

31. Plaintiff has not made the TWU-Local 555 a party to this lawsuit. Jones does not contend that the System Board was biased against him because of his race.

32. Both Jones and Rullman grieved their terminations under the provisions of the Union Contract. They each claimed they were terminated without just cause.

33. Both grievances proceeded to separate System Board hearings in Dallas, Texas, each held on January 29, 1998.

34. The System Board is an independent arbitration panel, established under the Union Contract, to hear and decide grievances. Pursuant to the terms of the Union Contract, the System Board's decisions "shall be final and binding on both the Company and the [TWU-Local 555]."

7

35.     The System Board is comprised of two Southwest Airlines appointees and two TWU-Local 555 appointees.

36.     The Union Contract provides that Southwest Airlines selects two of the four members of a System Board.  Generally, these members are selected from management ranks.  These members cannot be a direct report to the company representative who is presenting the Company's position to the System Board.  Because System Boards generally are held in Dallas, that location often plays a role in who is selected to sit at System Boards.

37.     The Union Contract requires that any Southwest Airlines managers selected not include the Vice President's staff.  A staff administrative coordinator for Southwest Airlines makes a blind request for two company "players" from a list of available leaders.  The company representative presenting to the System Board has no direct contact with the players selected to attend a System Board hearing.

38.     The TWU-Local 555 selects its two "players" from a standing list of Union members (not to include employees from its Board of Directors).

39.     The Jones' System Board make-up was entirely different from Rullman's System Board.

40.     For the Jones' System Board, Southwest Airlines selected Dennis Carvill, then a Ramp Supervisor in Los Angeles and Art Allison, the Station Manager in Dallas.  Both of these members were Caucasian. The TWU-Local 555 had no role in these selections.

41.     For the Jones' System Board, the TWU-Local 555 selected Thomas McCauley, a ramp agent in Dallas, and Keith Bills, an operations agent in El Paso. One of these members was Caucasian and one was African American. Southwest Airlines had no role in these selections.

42.     For the Rullman System Board, Southwest Airlines selected Paul Jensen, a Station Manager at Little Rock and Rusty Arnold, a Station Manager at San Antonio. Both are Caucasian. The TWU-Local 555 had no role in these selections.

43.     For the Rullman System Board, the TWU-Local 555 selected Don Williams, an Operations Agent at Midland, Texas, and Richard Miranda, a operations agent at El Paso to sit on Rullman's System Board. Mr. Williams is Caucasian, and Mr. Miranda is Hispanic. Southwest Airlines had no role in these selections.

44.     At the Jones' System Board hearing, Jones was represented by the President of the TWU-Local 555, Mark Goodwin. The witnesses at Jones' hearing included Jones, co-worker Hugh Barlow, co-worker Dale Judy, Dave DeMeyer, Peter Freymuth and Dane Nitz.

45.     At the Rullman System Board hearing, Rullman was represented by Gary Shults, a TWU-Local 555 District Representative. The witnesses at Rullman's hearing included Rullman, Fidel Garcia, Hugh Barlow, Dale Judy and Peter Freymuth.

46.  As is its practice, Willie Edwards, then Regional Director at Southwest Airlines presented the Company's position at both Jones' and Rullman's hearings. Mr. Edwards is African American.

47.  Mr. Edwards thoroughly investigated the terminations of both Jones and Rullman before presenting his positions to the System Board. Mr. Edwards reviewed all of the written documentation relevant to the December 1997 fight, made a station visit to Albuquerque to further investigate, and spoke to witnesses. As is typical of Mr. Edwards' preparation for a System Board hearing, he reviewed each grievant's last performance review and attendance record.

48.  Mr. Edwards believed both men were properly terminated and sought to have both termination decisions upheld. Mr. Edwards made similar presentations to both System Boards arguing in favor of upholding the terminations.

49.  At the System Board hearings, each grievant and the witnesses testified. The Union presented each grievant's testimony. Mr. Edwards cross-examined the grievants. Documents also were introduced and considered, including witness statements and the doctor's report indicating that Rullman had choke marks on his neck after the fight.

50.  Personnel files of the employees are not presented to a System Board and were not presented in either of these two System Board hearings.

51.  During closing argument at a System Board hearing, Mr. Edwards' common practice is to emphasize the conduct that warranted the discipline at issue,

10

and to discuss the grievant's latest performance review and/or attendance record if they support the Company's position. In the Jones' hearing and closing, Mr. Edwards' argument included that Jones was a participant in the fight, that he struck Rullman in anger, that his last annual performance review was unacceptable in many categories and that he had a poor record of attendance over the years. In the Rullman hearing and closing, Mr. Edwards' argument included that Rullman was a participant in the fight, that he struck Jones in anger, and that his attendance record was not perfect.

52.    Other than presenting Southwest Airlines' positions at the two System Boards, Mr. Edwards had no role in the decision of the System Board. Mr. Edwards does not sit through the deliberations nor have any contact with the System Board members to determine how they reached their conclusion.

53.    A System Board's deliberations are confidential. It is unknown what evidence may or may not have influenced the System Boards' final decisions as to these grievances.

54.    Jones' System Board voted 4-0, unanimously upholding Jones' termination. Pursuant to the terms of the Union Contract, the unanimous vote concluded Jones' grievance process. The decision is final and binding on Southwest Airlines and the grievant.

55.    The TWU-Local 555 did not have option to request an arbitration of Jones' grievance after a unanimous vote. Southwest Airlines did not have the option to reinstate Jones.

11

56.    A 4-0 unanimous System Board vote upholding termination is rare. Southwest Airlines is unaware of any precedent of reinstating, re-hiring or arbitrating the failed grievance of an employee whose termination was unanimously upheld by a System Board.

57.    Rullman's System Board split 2-2. The two Southwest Airlines managers' on the Board voted to uphold the termination. The two TWU-Local 555 members voted to reverse Rullman's termination.

58.    On January 31, 1998, the TWU-Local 555 requested an arbitration of Rullman's grievance because of the deadlock vote.

59.    Ruth Ann Chancellor, then Southwest Airlines Senior Director of Employee Resources, typically received the requests for arbitration and would review them to determine if Southwest Airlines should settle or proceed to arbitration.

60.    A very low percentage of all grievances filed with Southwest Airlines proceeds to arbitration. A deadlocked System Board often is an indicator to Southwest Airlines that it might not be successful at an arbitration.

61.    As is common in a deadlocked situation, the TWU-Local 555 later approached Southwest Airlines to attempt a compromise settlement related to Rullman, in lieu of proceeding to an arbitration.

62.    Southwest Airlines deliberated and decided to reinstate Rullman, rather than proceed to arbitration. Part of Southwest Airlines' reasoning in reinstating Rullman included that Rullman had a good work history. Rullman's latest

performance review, signed 9/6/97, shows that he had overall ratings of satisfactory in the categories of "attitude" and "aptitude." Within those categories, he received superior ratings in "adaptability/flexibility", "communication" and "bin slip completion." He received no "unacceptable" ratings. His supervisor commented that Rullman volunteered to stay late on a regular basis without being asked, that he worked well with his coworkers and that he had a high level of productivity. The supervisor also noted that Rullman put in 110% effort to every position he worked on the ramp and had a good attitude towards the Company.

63.     Rullman also had an excellent attendance record as of 1997. He actually had accumulated 4 negative points of attendance indicating that he had had no tardies, unreported absences, etc. in 1997. Seven positive points of attendance issues is the maximum an employee can accumulate under the Union Contract before termination may occur. Therefore, Rullman had perfect plus attendance in 1997. Although Rullman had unsatisfactory attendance in 1995-1996, he clearly had resolved the attendance problems.

64.     Also part of Southwest Airlines' reasoning in reinstating Rullman was Ms. Chancellor's assessment that Southwest Airlines might not be able to succeed at an arbitration. Under these circumstances, Ms. Chancellor believed that Southwest Airlines was better served to reinstate Rullman provided he clearly understood that any future similar conduct would not be tolerated.

65.     Rullman was reinstated, effective February 24, 1998.  He was placed on final written warning and was not given back pay.

**Proposed Conclusions of Law**

A.     Jurisdiction

1.     Jurisdiction of the United States District court is proper under 28 U.S.C. § 1331.  Jones asserts a single claim of disparate treatment race discrimination under Title VII of the Civil Rights Act.

2.     This Court has personal jurisdiction over both parties.

B.     Title VII Race Discrimination Claim

3.     To establish a prima facie case of disparate treatment race discrimination, Jones has the burden of proving that (1) he was a member of a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *Kendrick v. Penske Transportation Services, Inc.,* 220 F.3d 1220, 1229 (10th Cir. 2000)

4.     Jones, at all times, retains the burden of persuasion to prove that Southwest Airlines intentionally discriminated against him because of his race.  Jones may prove his claim through either direct or indirect evidence.

5.     Jones has no direct evidence of race discrimination.  For example, there is no direct evidence that Jones' termination had anything to do with his race or that the Southwest Airlines managers who made the decision considered Jones' race.

14

6.    None of the Southwest Airlines decision makers, involved in the termination decision, made disparaging remarks regarding Jones' race.

7.    Jones has no circumstantial evidence of race discrimination.

8.    The three-part *McDonnell-Douglas Corp. v. Green* burden shifting analysis is used to assess circumstantial evidence of discrimination. However, this analysis is limited to the summary judgment context and drops out once a case proceeds to trial. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

9.    The sole issue at trial is whether Jones has adduced sufficient evidence to warrant the fact finder's determination that the adverse employment action was taken against him because of his race.   *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

10.   Southwest Airlines had legitimate, non-discriminatory reasons for terminating Jones and Rullman.  Both men were terminated for identical reasons as set forth in Southwest Airlines' Basic Rules of Conduct: interfering with fellow employees or their work, participating in a fight with another employee, unacceptable behavior on company property, abusive and disrespectful behavior to a fellow employee and/or striking a co-worker in anger.

11.   Southwest Airlines had legitimate business reasons for reinstating Rullman after the two System Boards' different results.  Because the System Board hearings were final and binding on both the Company and the grievant, the

unanimous vote to uphold Jones' termination closed his grievance. Under the Union Contract, Southwest Airlines had no option to reinstate Jones or to proceed to arbitration on Jones' grievance. However, because the Rullman System Board deadlocked, the TWU-Local 555 was permitted to request an arbitration and did so. Southwest Airlines then had the option to proceed to arbitration or to settle the grievance in some other manner short of arbitration.

12. Southwest Airlines reinstated Rullman for legitimate business reasons: (1) to avoid a costly arbitration; (2) to avoid losing an arbitration since a deadlocked System Board vote was an indicator to Southwest Airlines that it might not be successful at an arbitration; and (3) to give Rullman another chance since his work history and attendance were good. In particular, his most recent 1996-97 annual performance review was good.

13. Southwest Airlines' legitimate business reasons for these decisions were truthful.

14. Southwest Airlines did not act contrary to a written company policy either in terminating Jones or in later reinstating Rullman after the deadlocked System Board vote.

15. Southwest Airlines did not act contrary to an unwritten policy or practice either when it terminated Jones or when it later reinstated Rullman after the deadlocked System Board vote.

16. Southwest Airlines did not treat Jones differently from other similarly-situated employees who violated work rules of comparable seriousness.

16

17.     Jones has not presented any evidence that Southwest Airlines' termination or reinstatement decisions were pretextual.   Jones has not presented any evidence that Southwest Airlines took any actions towards him because of his race.

18.     In terminating Jones and Rullman, Southwest Airlines treated Jones and Rullman identically for the same violations of its Basic Rules of Conduct.

19.     When Southwest Airlines reinstated Rullman, Jones was not similarly situated to Rullman because of the different System Board votes and the subsequent request for arbitration by the Union on Rullman's behalf.

20.     When Southwest Airlines reinstated Rullman, Jones was not similarly situated to Rullman because Rullman had a much better work history, attendance record, and recent annual performance review.

21.     It is the manager's perception of the employee's performance, and not the employee's subjective evaluation of his performance, that is relevant in determining pretext. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (internal citation omitted).

22.     A mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (internal citation omitted).

23.     To offer evidence of disparate treatment, Jones must show that these other employees were similarly situated and had violated work rules of comparable seriousness. An employee who deals with the same supervisor and is subject

17

to the same standards governing performance might be similarly situated. Relevant employment circumstances, such as work history and applicable company policies also determine whether the employees were similarly situated. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

24. Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (*citing EEOC v. Flasher*, 986 F.2d at 1319).

25. The incident between Chris Peterson and Vince Lujan in 1994 does not support a finding of pretext or disparate treatment because they were not similarly situated. June 21, 2000 Memorandum and Opinion at p. 9.

26. The incident between Rullman and Cahill (African American) that occurred in the break room in about 1995 also does not support a finding of pretext or disparate treatment. First, the incident is not similar to the one at issue here. The two employees were not fighting or trading blows. They were rough housing or engaged in horse play in the break room, away from public view. While the Basic Rules of Conduct state that horseplay is grounds for discipline, that discipline may range from a reprimand to discharge. The manager, by necessity, must have some discretion in determining what action is appropriate. Their supervisor did not perceive this incident to be in the

18

nature of a fight.   Second, Rullman had a very good work history and attendance record at that time.  He later, in 1996, had some attendance problems that he subsequently corrected.  Finally, this incident occurred two years before Jones was terminated, greatly reducing any evidentiary value it might have. *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1233-34 (10th Cir. 2000).

27.   The incident between Joe Mascarenas and Robbie Johnson in 1997 does not support a finding of pretext or disparate treatment.   June 21, 2000 Memorandum and Opinion at p. 10.

28.   Alleged incidents that certain Caucasian employees exceeded the permissible point level for attendance issues without being terminated does not support a finding of pretext or disparate treatment.  Southwest Airlines' Basic Rules of Conduct provides that a poor attendance record is grounds for discipline, ranging from a reprimand to discharge, depending on the circumstances.  In addition, the Union Contract sets forth certain provisions regarding attendance.  Under the Contract, an employee accumulates points towards possible discipline for being tardy, not showing up to work, and/or absences. If the employee reaches 7 points, he or she may be terminated under the Union Contract.   However, the Union Contract requires that the employee first be given a fact finding meeting to determine if the Union Contract was violated.  The fact finding meeting may result in lesser discipline than a discharge.  An attendance policy of this nature is not a rule of comparable

19

seriousness to the prohibition of fighting in the work place or hitting another co-worker in anger. In addition, the four employees identified by Jones were appropriately disciplined and are not similarly situated to Jones. In some situations, they were terminated, but the decision was appealed by the Union and the employee was given an additional window of time in which to improve, or they were reinstated after the grievance process.

29.    Jones was not wrongfully discharged from work.

30.    Jones was not discriminated against on the basis of race.

31.    Jones cannot recover damages under a theory of wrongful discharge.

32.    Jones is not entitled to any relief or damages under Title VII.

33.    Jones has failed to mitigate his damages.

34.    Jones' claims under Title VII for race discrimination and any other claim he attempts to assert will be dismissed with prejudice.

35.    As the prevailing party, Southwest Airlines is entitled to an award of reasonable attorney's fees and its taxable costs.

Respectfully Submitted by,

GILKEY & STEPHENSON,  P.A.


_____
Duane C. Gilkey
Mary Woodward
Attorneys for Defendant Southwest Airlines
P.O. Drawer 25566
Albuquerque, NM 87125
(505) 242-4466
(505) 242-3145 (fax)

21